Joseph L. QUEEN and Cornelius T. Moultrie, Individually and on behalf of all other persons similarly situated

v.

DRESSER INDUSTRIES, INC., Harbison-Walker Refractories Company, United Steelworkers of America, AFL–CIO–CLC, and United Steelworkers of America, Local 14601.

Civ. No. B–75–411.

United States District Court,
D. Maryland.

Aug. 2, 1978.

258

Kenneth L. Johnson, Baltimore, Md. and Jack Greenberg and Clyde E. Murphy, New York City, for plaintiff.

Andrew M. Kramer, Washington, D. C. and John H. Lewin, Jr., Baltimore, Md., for Dresser Industries and Harbison-Walker.

Frank Petramalo, Jr., Washington, D. C., and I. Duke Avnet, Baltimore, Md., for United Steelworkers and its Local.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

This class action lawsuit was brought on April 4, 1975 by Joseph Queen and Cornelius Moultrie against Harbison-Walker Refractories (Baltimore plant), a division of Dresser Industries, Inc. (the company), and

the United Steelworkers of America, AFL–CIO and its Local 14601 (the union). Plaintiffs Queen and Moultrie, two black employees of the company, alleged that defendants had discriminated against them and their class, on the basis of race, with respect to employment opportunities in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Prior to filing suit, Queen filed a charge of racial discrimination with the Equal Employment Opportunity Commission (EEOC) on March 4, 1974; Moultrie filed an identically worded charge on March 28, 1974. (PX 5).[1] Subsequently, each plaintiff received from the EEOC a Notice of Right to Sue and jointly instituted this action within the time permitted by 42 U.S.C. § 2000e–5(f)(1). Jurisdiction over this case is therefore proper under 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. §§ 1331, 1343(3), 1343(4).

By Order of December 7, 1977, this case was certified as a class action; Queen and Moultrie were designated class representatives.[2] The class as certified consists of all past and present black hourly employees of defendant company who are represented by defendant union.[3] Past employees who were not employed during the relevant limitation period were not included in the class. Hence, the § 1981 class was limited to those persons who were employed by defendant company on or after April 4, 1972. The Title VII class included all employees who were employed on or after September 5, 1973.

Trial of this action began before this court on May 1, 1978 and was concluded on May 3, 1978. Plaintiffs' major allegation at trial was that defendant company had discriminated against blacks in initial job assignments. Plaintiffs also alleged discrimination by the company with respect to discipline and termination, promotion and transfer, and maintenance of racially segregated units. Defendant union was said to have participated and acquiesced in the alleged discrimination by the company.[4] At the conclusion of plaintiffs' case in chief, both company and union defendants moved to dismiss under Rule 41(b) of the Federal Rules of Civil Procedure, contending that plaintiffs had shown no right to relief. The company's motion was granted as to the individual claims of Queen and Moultrie and denied as to the class claims. The union's motion was granted as to both the individual and class claims. The case then proceeded on the class claims against the company, with the company offering evidence to refute plaintiffs' allegations of racial discrimination. After fully considering all of the evidence presented by all parties to the case, this court makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### Background Facts

The Baltimore plant of Harbison-Walker is engaged in the manufacture of refractory products, such as heat resistant industrial bricks. These products are manufactured primarily from magnesite and chrome ore. Over 470 persons are employed in the plant (DX 3) and at all relevant times the hourly production and maintenance employees have been represented by defendant union. Hourly employees work within one of the seven departments maintained at the plant.[5] These departments are casing,

---

1. Plaintiffs' exhibits are referred to as "PX," company exhibits as "CX," and union exhibits as "UX."

2. At the close of the plaintiffs' case, Queen was severed as a class representative and member.

3. The union represents all production and maintenance employees of the company.

4. Before trial, plaintiffs abandoned a number of other claims raised in the complaint. At trial, plaintiffs' counsel, Mr. Johnson, indicated that the claim of utilizing an arbitrary rating system which had the effect of discriminating against blacks was abandoned. Also, after plaintiffs abandoned the seniority issue under Title VII, this court dismissed the seniority issue under § 1981. *See* Memorandum and Order of April 17, 1978.

5. There are five hourly employees who do not work within the seven departments, but serve as watchmen and messengers. The parties did not address these miscellaneous employees at

grinding, kiln, maintenance, metalkase, moulding and pressing, and shipping.

James Clark, manager of the Baltimore plant, testified at trial and gave an overview of the production process and the roles of the various departments at the company. He testified that the grinding department receives the necessary raw materials from the company's suppliers. These materials are unloaded in that department and, if necessary, crushed or ground to suit the company's need. Next, the materials are hauled, by front end loader, to drying machines where they are dried and then taken to feed bins. The moulding and pressing department procures the materials from the feed bins, mixes them and delivers the mixed product to the power presses where the refractory bricks are actually formed. Some of the formed bricks are then sent to the shipping department; others require further treatment and are sent to the kiln department where they are fired and then forwarded to shipping. Once in the shipping department the bricks are unloaded and some of them are sent to the company's customers. Others are sent to the casing department where a metal casing is applied. The metal plates which are used in this casing process are manufactured in the metalkase department. The maintenance department is not directly involved in the manufacturing process. Rather, it is responsible for the repair and replacement of plant machinery and equipment.

Of a total of 474 persons employed by the company in both hourly and non-hourly positions in 1977, 224 were black, 245 were white and 5 were in some other minority classification. (DX 3). Thus, 47.3% of the company's total work force in 1977 was black. When the period from 1973 to 1977 is considered, the average number of total company employees, both hourly and non-hourly, was 479. (DX 3). Throughout that period, the average number of black employees was 232 or 48.4%; the average number of white employees was 244 or 50.9%; the average number of employees in other minority groups was 4 or .8%. (DX 3).

In 1977 the company received 1,262 applications for employment; 509 or 40.3% of these applications were submitted by blacks. (DX 5). From 1973 to 1977, 5,834 applications were received by the company; 3,016 or 51.7% of these were from black applicants. (DX 5). A total of 48 persons were hired in 1977; 26 or 54.2% of these new employees were black. (DX 4). For the period from 1973 to 1977 the company hired 462 employees; 249 or 53.9% of those hired during that period were black. (DX 4). Thus, for the four-year period from 1973 to 1977, the percentage of black employees hired exceeded the percentage of black applicants for employment. This fact also holds true for 1977 when that year is considered separately.

The minority population for the Baltimore Standard Metropolitan Statistical Area (SMSA) is 23.9% of the total population. (DX 2). Within the Baltimore SMSA, blacks represent 20.4% of those holding any type of job, 14% of those holding craft jobs, 31% of those holding semi-skilled jobs, and 46% of those holding laborer jobs (DX 7). At defendant company, black employees hold approximately 25% of all craft jobs, 75% of all semi-skilled jobs, and 53% of all laborer jobs.[6] Stated another way, the company's percentages of black employees in all job classifications far exceeds the parallel percentages of blacks employed by other employers in the same geographical area.

With respect to wages, the average annual earnings in 1977 for hourly employees hired between 1970 and 1977 was $10,843.85. (DX 8). The average wage earned by white hourly employees hired during

___

trial and they are not considered in this opinion.

**6.** These figures are taken from the Employer Information Reports (EEO–1) submitted to the EEOC by the company and introduced at trial as PX 8. They are approximated because only

the 1970 to 1974 reports were introduced into evidence. As a result, this court is unable to determine the exact categorical breakdown at the company for any year after 1974 and has therefore estimated these numbers by using the 1973 and 1974 EEO–1 reports.

that period was $11,021.97. For black hourly employees, the average wage was $10,-656.00. (DX 8).

Against this background, defendant company hardly appears to be the bastion of discrimination that plaintiffs claim it to be. It rather appears at first glance that the company is the very model of non-discrimination and equal employment opportunity. As shown below, a closer examination of the company does not alter this view, but rather serves strongly to confirm it.

### Class Claims

■ The allocation of proof in a class action alleging racial discrimination was discussed by the Supreme Court in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).[7] Initially, plaintiffs have the burden of making out a prima facie case by showing that unlawful discrimination has been a regular procedure or policy of the defendant employer. *Id.* at 360, 97 S.Ct. 1843. In the words of the Supreme Court, plaintiffs must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* at 336, 97 S.Ct. at 1855. *Hazelwood School District v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ In cases where disparate treatment based on race is alleged, it is necessary for the plaintiffs to show a discriminatory motive or intent on the part of the defendant in order to prevail on a Title VII claim. *Teamsters v. United States, supra,* 431 U.S. at 335–36 n.15, 97 S.Ct. 1843. Where, however, the plaintiffs allege that facially neutral employment practices have a disparate impact on members of their race, discriminatory intent need not be

shown. *Id.; Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Plaintiffs perceive this case as falling into the disparate impact category thus obviating the need for any showing of intent with respect to their Title VII claim. However, in this court's view, this action is properly characterized as a disparate treatment case, thereby requiring a showing of discriminatory animus. In any event, as shown below, plaintiffs have failed to meet their burden of proving racial discrimination by defendants with or without any requirement for proof of discriminatory intent.[8]

■ It is beyond dispute that statistics play an important role in cases alleging racial discrimination. *Teamsters v. United States, supra,* 431 U.S. at 339 n.20, 97 S.Ct. 1843. Moreover, the established law of this circuit is that, in an appropriate case, statistics alone may establish a prima facie case of discrimination. *Roman v. ESB, Inc.,* 550 F.2d 1343, 1350 (4th Cir. 1976); *Barnett v. W. T. Grant,* 518 F.2d 543, 549 (4th Cir. 1975). Nevertheless, statistics which show isolated or minor racial discrepancies in an employer's work force do not serve to satisfy plaintiffs' burden of proof. Rather, "gross statistical disparities" must be demonstrated. *Hazelwood School District v. United States, supra,* 433 U.S. at 307, 97 S.Ct. 2736. As stated by the Fourth Circuit:

[W]e do not believe that isolated bits of statistical information necessarily make a *prima facie* case when divorced from other and contrary statistics and from the statistical picture of all the employment at the plant. We also think the absence of other evidence of discrimination should be considered in determining whether a *prima facie* case is made, just as the

---

**7.** While *Teamsters* was a "pattern and practice" suit brought by the Government under 42 U.S.C. § 2000e–6(a), its discussion relating to burden of proof is fully applicable to a class action brought by a private party where that private party alleges a pervasive and broad based course of discrimination by the defendant employer. *See Teamsters v. United States,* 431 U.S. at 359–60, 97 S.Ct. 1843.

**8.** As stated in this court's April 17, 1978 Memorandum and Order, intent is a necessary element of any claim brought for a violation of 42 U.S.C. § 1981. *See also Lewis v. Bethlehem Steel,* 440 F.Supp. 949, 965 (D.Md.1977).

presence of other evidence of discrimination should be considered in arriving at the same conclusion.

*Roman v. ESB, Inc., supra,* 550 F.2d at 1350.

If the plaintiffs do meet their burden of proving a prima facie case, the defendant has the opportunity to rebut the demonstrated inference of discrimination. One method that the defendant may use to rebut plaintiffs' case is to show that the plaintiffs' statistics are inaccurate or insignificant. *Teamsters v. United States, supra,* 431 U.S. at 339–40 & n.20, 97 S.Ct. 1843. An alternate method of rebuttal is to refute plaintiffs' evidence by means of other statistical evidence. *Roman v. ESB, Inc., supra,* 550 F.2d at 1351. Should the defendant successfully rebut plaintiffs' prima facie case, plaintiffs are given the opportunity to show that defendants' employment practices are not truly non-discriminatory but are, in fact, a pretext for discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

With the foregoing analysis of the burden of proof requirements in mind, an examination of plaintiffs' specific class claims can be made. The essential thrust of plaintiffs' entire case was that black employees of the company are initially assigned to one of the seven departments at the company in a discriminatory manner.[9] Plaintiffs centered their attack on the maintenance department, contending that this is the most desirable of the seven departments and arguing the blacks are assigned to that department in disproportionately low numbers because of their race. Plaintiffs also attempted to show that blacks are assigned to the allegedly undesirable grinding department in numbers significantly higher than their white counterparts.

Plaintiffs' evidence at trial consisted of the testimony of Queen and Moultrie, the two named plaintiffs, and the testimony of Gary Armsted, a former employee of the company. Additionally, plaintiffs presented the testimony of Dr. Alan Gittelsohn, an expert in the field of biostatistics. Finally, plaintiffs introduced into evidence a wealth of statistical data, much of which was disorganized and difficult to collate into useful information.[10]

The testimony of Queen, Moultrie and Armsted deserves little comment with regard to plaintiffs' class claims.[11] Nevertheless, there is nothing in the testimony of these three individuals which would tend to indicate racial discrimination in initial assignment on the part of the defendant company. Armsted applied for a job with the company in December of 1973. He indicated a desire to work as either a tow motor operator or a laborer. (DX 13). There was no evidence that he was qualified for a tow motor operator position or that such a position was open. He was, however, given a job as a laborer and assigned to the moulding and pressing department. Armsted was later given the opportunity to transfer to the maintenance department but chose not to do so. (DX 14).

Moultrie was hired into the metalkase department after failing to indicate any job preference on his application. (DX 17).

9. Plaintiffs are apparently in agreement with this evaluation of their case. At oral argument at the close of plaintiffs' case, counsel for the plaintiffs stated that plaintiffs' claim is basically that there is discrimination in initial assignment by the company.

10. For example, plaintiffs introduced into evidence seven different seniority rosters showing the seniority status of all company employees as of February 1972; January 1973; January 1974; January 1975; January 1976; January 1977 and February 1978. (PX 15). Only the February 1978 and the January 1973 rosters were race coded and only the February 1978 roster was referred to at trial. The intended purpose of introducing the other six rosters is unknown to this court. In the same vein, plaintiffs introduced *all* of the defendants' interrogatory answers, but made little attempt to explain or organize the information contained therein. Such a disorganized presentation has made it quite difficult for this court to analyze the evidence and make the necessary findings of fact.

11. Plaintiffs' class claims clearly stand or fall on their statistical evidence. In their proposed findings of fact, plaintiffs do not refer at all to the testimony of Queen, Moultrie or Armsted.

Contrary to the plaintiffs' assertion that blacks are prevented from entering the maintenance department, Moultrie himself was transferred into that department and remained there at the time of trial. Queen, like Moultrie, listed no job preference on his application (DX 20) and was assigned to the grinding department upon being hired. His father and a number of other relatives had worked for the company for quite some time and it is reasonable to infer that Queen was familiar with the various departments. His failure to list a job preference, therefore, is somewhat surprising. In any event, this court finds no credible evidence of discrimination in initial assignment from the testimony of Queen, Moultrie or Armsted.

Before examining and evaluating the testimony of Dr. Gittelsohn, an overall racial breakdown of the employees by department for the period 1972 to 1975 will be given.[12] These figures will serve to place Dr. Gittelsohn's testimony in the proper context:

| YEAR | DEPARTMENT | TOTAL | BLACK | WHITE | OTHER MINORITY |
|------|------------|-------|-------|-------|----------------|
| 1972 | Kiln | 31 | 17 (55%) | 14 (45%) | 0 |
|      | Metalkase | 27 | 23 (85%) | 4 (15%) | 0 |
|      | Casing | 44 | 30 (68%) | 14 (32%) | 0 |
|      | Shipping | 37 | 30 (81%) | 7 (19%) | 0 |
|      | Grinding | 38 | 35 (92%) | 2 (5%) | 1 (3%) |
|      | Moulding & Pressing | 101 | 75 (74%) | 26 (26%) | 0 |
|      | Maintenance | 107 | 18 (17%) | 88 (82%) | 1 (1%) |
|      | Grand Totals | 385 | 228 (59%) | 155 (40%) | 2 (1%) |
| 1973 | Kiln | 36 | 20 (56%) | 16 (44%) | 0 |
|      | Metalkase | 27 | 23 (85%) | 4 (15%) | 0 |
|      | Casing | 35 | 25 (71%) | 10 (29%) | 0 |
|      | Shipping | 34 | 26 (76%) | 8 (24%) | 0 |
|      | Grinding | 39 | 35 (90%) | 3 (8%) | 1 (3%) |
|      | Moulding & Pressing | 80 | 62 (78%) | 18 (23%) | 0 |
|      | Maintenance | 106 | 19 (18%) | 86 (81%) | 1 (1%) |
|      | Grand Totals | 357 | 210 (59%) | 145 (41%) | 2 (1%) |
| 1974 | Kiln | 41 | 23 (56%) | 18 (44%) | 0 |
|      | Metalkase | 34 | 27 (79%) | 7 (21%) | 0 |
|      | Casing | 39 | 28 (72%) | 11 (28%) | 0 |
|      | Shipping | 41 | 27 (66%) | 13 (32%) | 1 (2%) |
|      | Grinding | 48 | 40 (83%) | 7 (15%) | 1 (2%) |
|      | Moulding & Pressing | 93 | 63 (68%) | 30 (32%) | 0 |
|      | Maintenance | 129 | 27 (21%) | 101 (78%) | 1 (1%) |
|      | Grand Totals | 425 | 235 (55%) | 187 (44%) | 3 (1%) |
| 1975 | Kiln | 35 | 22 (63%) | 13 (37%) | 0 |
|      | Metalkase | 28 | 21 (75%) | 7 (25%) | 0 |
|      | Casing | 33 | 22 (67%) | 10 (30%) | 1 (3%) |
|      | Shipping | 48 | 32 (67%) | 15 (31%) | 1 (2%) |
|      | Grinding | 48 | 39 (81%) | 8 (17%) | 1 (2%) |
|      | Moulding & Pressing | 70 | 41 (59%) | 29 (41%) | 0 |
|      | Maintenance | 113 | 23 (20%) | 89 (79%) | 1 (1%) |
|      | Grand Totals | 375 | 200 (53%) | 171 (46%) | 4 (1%) |

12. This data has been extracted from the company's answer to plaintiffs' interrogatory 14(f)(4). These interrogatory answers were introduced into evidence as PX 31. No departmental breakdown was provided for the years 1976 and 1977.

Even a cursory review of these figures demonstrates that blacks were substantially represented in every department at the company. Unquestionably, the breakdowns show that departmental percentages were not precisely balanced with regard to race. However, a completely balanced work force, even with respect to the total number of employees, is not required. *See* 42 U.S.C. § 2000e–2(j); *Teamsters v. United States, supra,* 431 U.S. at 339–40 n.20, 97 S.Ct. 1843. It goes without saying then that exact racial balance on a departmental level is also not required.

This brings the court to the testimony of Dr. Gittelsohn, which is relied on so heavily by the plaintiffs. Preliminarily, it bears mention that this case was pending here for three years before going to trial and was also before the Maryland Commission on Human Relations for some time prior to the complaint being filed here. Despite this considerable period of time which the parties had to prepare for the trial of this action, Dr. Gittelsohn was not retained by the plaintiffs until nine days before trial. (Tr. 7).[13] Furthermore, the data furnished to Dr. Gittelsohn was not reviewed at all by him until the morning of the day on which he gave his testimony. (Tr. 31–32). In such a short period of time it would be impossible, even for a professional with credentials as impressive as those possessed by Dr. Gittelsohn, to assemble and analyze in a meaningful manner the information necessary to give an opinion of any probative value in a case of this magnitude. This conclusion is borne out by a closer examination of his testimony.

Dr. Gittelsohn's calculations relating to the initial assignment of newly hired company employees were based solely on the information contained in plaintiffs' exhibits 15(a), (c), (d), (h), (i), and (j). (Tr. 8–9). These exhibits were assembled by Ms. Jacqueline Hardy, a research assistant employed by plaintiffs' attorney. They were prepared from the February 1978 seniority list (PX 15) and purport to show, by name and race, the direct hires into six of the company's seven departments since April 4, 1972. This was done by comparing an employee's company seniority date with his departmental seniority date and listing as a new hire into a given department any employee for whom the two dates matched. These charts are deficient in at least two significant respects. First, the charts do *not* show direct hires into a department since April 1972, but instead show direct hires into a department who are still employed in that department. Since they are based solely on the seniority roster of *current* employees on a single day in February 1978, they do not show the employees who were hired into a department from April 1972 to February 1978 but who left the company or the department prior to February 1978. Secondly, the seniority list from which the charts were prepared makes no attempt to address the position for which an employee was hired and the qualifications, if any, required for that position. The second deficiency is particularly relevant with respect to the maintenance department because many of the jobs within that department require special skills.

Utilizing these charts, Dr. Gittelsohn reached the statistical conclusion that in the casing and grinding departments there were a significantly higher proportion of black direct hires than what would be statistically expected. (Tr. 12). He further concluded that in the maintenance department there was a significantly lower proportion of black direct hires than what would be expected. (Tr. 12). As to the maintenance department, PX 15(d) shows that since April 4, 1972 ten employees were directly hired into the maintenance department and still remain with that department. All of these employees are white. Dr. Gittelsohn testified that, given the notion that persons are hired independently of race, the probability of having no blacks hired into a department out of ten hires is less than one in a thousand. This figure

---

**13.** The parties have provided the court with a transcript of the testimony of Dr. Gittelsohn. The references in the text are to that transcript.

would indeed be an impressive indicator of racial discrimination if it were the result of a meaningful study based on relevant data. However, as stated above, this court does not believe the data on which Dr. Gittelsohn based his conclusion was genuinely related to initial assignment to any given department. A painstaking examination of other evidence in the record concerning the maintenance department shows that the incompetency of plaintiffs' charts on direct hires is more than mere suspicion. Defendants' answer to plaintiffs' interrogatory 54(f), (PX 31), shows all new hires, transfers and terminations from July 1970 to January 1975. A review of those interrogatory answers shows that subsequent to April 4, 1972 there were in fact blacks hired and initially assigned to the maintenance department contrary to the assertion made in PX 15(d).[14]

There is one other factor which weakens Dr. Gittelsohn's testimony, and plaintiffs' case, even further with respect to initial assignments to the maintenance department. Pursuant to the terms of the collective bargaining agreement between the company and the union a bid system controls the filling of all job vacancies above the laborer level at the plant. By the terms of that bid system, notices of job vacancies are posted throughout the plant and all interested employees can fill out a bid slip for that job. If an employee within the department where the vacancy arose bids on the job and is qualified, that employee is awarded the job on the basis of departmental seniority. If no bid is received from an employee within the department, the job goes to the most senior bidder from any other department on the basis of plant seniority. The bidding procedure is the same for both blacks and whites and has been utilized by employees of both races. Prior to 1973, all laborer positions were filled by off the street hiring. However, beginning in 1973, there was a change concerning the filling of laborer positions within the maintenance department. That change gave all employees in the plant an opportunity to fill laborer vacancies in maintenance on the basis of plant seniority before the company would look to new employees to fill such vacancies. On February 21, 1974 this new procedure was reduced to writing (PX 14) and was later incorporated into the collective bargaining agreement (UX 3 at p. 50 § L.A. 47). The net result of the new procedure for the maintenance department is that no new employee has been initially assigned to the maintenance department in the laborer or entry level position since July of 1973.[15] Accordingly, all post-July 1973 new hires to the maintenance department have been into skilled jobs where no employee of the plant bid or was qualified. In fact, five of the ten white new hires into maintenance listed on PX 15(d) were hired to fill vacancies in skilled jobs within that department.[16]

▮ In sum, this court finds Dr. Gittelsohn's testimony relating to initial assignments to be utterly without probative value for the reason that it was based on misleading and incomplete data. Dr. Gittelsohn himself indicated that in order to render an expert opinion on the basic question of whether there had been racial discrimination by the company he would want to have the work history of each employee, the skill factor for each job, the wage levels at the company and a great deal of time in which

14. The interrogatory answer shows that the following blacks were hired and initially assigned to maintenance after April 4, 1972: Wendall Jones (May 23, 1972); Zachary L. Taylor (April 9, 1973).

Additionally, Chester Oliver, a black employee, was directly hired into the maintenance department on April 3, 1972 and remains in that department.

15. This does not include new employees who were assigned to the maintenance department but transferred to another department within the 30-day probationary period. Such employees are considered to be initially assigned to the department in which they were working at the end of their 30-day probationary period.

16. Defendants' exhibit 11 shows that William Harper and James Bartos were hired to fill openings in the "Electrician 1st" position; Hunter McLaughlin, John Weatherstein and Danny Cook were hired to fill openings in the "Repairman 1st" category.

to analyze this information (Tr. 46–51). Obviously, Dr. Gittelsohn did not have all of this data. Moreover, as stated earlier, he was given very little time in which to assess the information he did have. The lack of weight given his testimony is a reflection of these deficiencies.

■ This court concludes that the company has not engaged in racial discrimination in initial assignment with respect to the maintenance department or any other department at the plant. The plain fact of the matter is that at least since the enactment of Title VII blacks have not been excluded from any department at the company. The high percentage of whites currently employed in the maintenance department is largely the result of a residual of senior employees who have been in that department for over 20 years.[17] Furthermore, since 1972, 85 total employees have entered the maintenance department by way of transfer, bid or hire. Of these 85 employees, 28 were black. (DX 11). This is hardly evidence of a discriminatory policy, particularly when one considers the skill requirements for many of the maintenance positions for which blacks were sought but were not available.[18]

■ Plaintiffs' claims of discrimination in areas other than initial assignment are also without merit. The allegation that the company maintains racially segregated units is utterly specious, as shown by the aforegoing discussion. Also, the averment that blacks are discriminated against with respect to promotion and transfer is groundless. As noted above, transfer and promotion are governed by the collective bargaining agreement which essentially provides that seniority shall govern all promotions and transfers. There is absolutely no evidence to suggest that this transfer and promotion procedure discriminates against blacks.[19] Finally, plaintiffs' claim of classwide discrimination in the area of discipline is not supported by the evidence. Plaintiffs' exhibit 21 lists employees disciplined from November 1973 to March 1975 and indicates that during that period more blacks than whites received disciplinary warnings.[20] It does not, however, show a discriminatory pattern with regard to employee discipline for the obvious reason that it does not show any of the facts leading to the disciplinary warning and does not indicate in any way that blacks received undeserved warnings. It does show that both blacks and whites were disciplined by the company for similar offenses. Moreover, credible testimony from Ms. Helen Schrader was to the effect that of the current black employees of the company 79 have *never* been disciplined and another 20 have been issued only one disciplinary ticket. To the same end, testimony of Gregory Thomas indicated that in 1977 there were 28 blacks and 27 whites who received disciplinary sus-

17. The seniority list for February 1978 (PX 15) shows that 46 white employees in the maintenance department have been with that department since 1955 or earlier.

18. Gregory Thomas, the personnel manager for the company who himself is black, testified that, as a part of the company's affirmative action plan, attempts have been made to hire black employees into the skilled jobs in maintenance.

19. The testimony of Dr. Gittelsohn regarding the percentage of black foremen and supervisory personnel does not indicate that there was a discriminatory policy in that area. Dr. Gittelsohn testified that from 1970 to 1975 the percentage of black foremen and supervisors at the company ranged from 4% to "nearly 10%" (Tr. 16). He compared these percentages with "a very conservative expectancy of . . . 20%" (Tr. 16), and concluded that blacks were

represented in disproportionately low numbers in the supervisory ranks (Tr. 16). Again, his testimony is completely without value. First of all his expectancy figure was based on the national population and bears no relationship to the number of blacks in this area who are employed in such positions. Also, the skill and qualification levels needed for such positions were not considered at all by Dr. Gittelsohn. It should be remembered that the class here is limited to hourly employees and as a result the supervisory positions at the company are outside the scope of this lawsuit. In any event, this court finds no credible evidence of racial discrimination with respect to the filling of supervisory positions at the company.

20. A number of the names on this exhibit are not race coded at all.

pensions. On the whole then, this court finds that the company has not engaged in a discriminatory policy of discipline with regard to its black employees.

As to the company, this court's ultimate finding of fact is that the plaintiffs have failed to meet their burden of proving discrimination. Far from being an employer whose standard operating procedure is to discriminate against employees on the basis of race, the company appears to be an equal opportunity employer in every sense of the word. Simply stated, employment decisions at the company are made on the basis of need, ability and seniority, not race. Accordingly, judgment will be entered for the company with respect to plaintiffs' class claims.

Up to this point, little has been said about plaintiffs' claims against the union. This is not by accident but is merely a reflection of the complete lack of evidence of any discriminatory conduct on the part of the union. As noted earlier, plaintiffs' claims against the union are based on the contention that the union acquiesced in the alleged discrimination by the company. While the union strongly argues that, as a matter of law, acquiescence will not subject it to liability in the absence of some affirmative act of discrimination on its part, this court finds no need to rule on that question because the plaintiffs failed to show that the union acquiesced in any discrimination by the company. Certainly, this fact naturally follows from the above conclusion that the company has not discriminated against blacks. But even if the finding for the company is put aside the evidence demonstrates no discriminatory conduct or acquiescence by the union. Since at least 1970, a majority of the union members at the plant have been black. The union has had black officers, including its current President and Vice-President. Blacks have held positions as shop stewards at the plant and have also held positions on the contract negotiating committee and the grievance committee. All of these officers and representatives are chosen by the membership of the local union. Also, the union and the company agreed to a non-discrimination clause which was embodied in the 1972 collective bargaining agreement. That provision reads as follows:

> It is the continuing policy of the Company and the Union that there be no discrimination against any employee with respect to hiring, upgrading, promotion, transfer, and layoff or the application of any other provision of this Agreement because of race, creed, color, national origin, age or sex.

(UX 3 at p. 32). This same provision was included in the 1974 bargaining agreement (UX 3 at p. 35). In light of this evidence, and the complete absence of any evidence tending to indicate union discrimination, this court finds that the plaintiffs have failed to meet their burden of proof with respect to their class claims against the union.

### Individual Claims

As stated earlier, the individual claims of plaintiffs Queen and Moultrie were dismissed at the close of the plaintiffs' case pursuant to Rule 41(b) of the Federal Rules of Civil Procedure since upon the facts and the law they had shown no right to relief. What follows are the findings of fact and conclusions of law with respect to these individual claims.

Even at this point in time it is not entirely clear in what manner plaintiffs Queen and Moultrie feel they have been discriminated against. From their testimony, it seems that their personal complaints are aimed at perceived discrimination in the areas of initial assignment and discipline. Regardless of the precise contours of their individual claims, it is the considered opinion of this court that neither Queen nor Moultrie has been the victim of racial discrimination by either the company or the union. To the contrary, it appears that only the company's firm commitment to equal employment opportunity has kept it from terminating these two employees.

Joseph Queen was hired by the company on February 19, 1970. No preference was indicated by Queen on his job application

(DX 20) and he was assigned to the grinding department as a laborer. There is no credible evidence which would indicate that this assignment was made on the basis of his race. Queen testified that when he was informed that he would be starting as a laborer he replied that he felt he was qualified for a better position than that. When asked by the court what qualifications he felt he had, he stated that he could type 25 words per minute. Certainly, being able to type 25 words per minute does not qualify a person for any skilled position.

Queen has remained in the grinding department throughout his term of employment with the company. He has never bid on a job in another department claiming that he was deterred from doing so by the potential loss of departmental seniority. While this testimony is of doubtful credibility, it does not indicate discrimination since any employee, white or black, is subject to this same loss of seniority upon leaving one department and entering another.

Queen's work history is very poor when judged under even the most lenient criteria. He has, by his own admission, been absent from work on numerous and extended occasions. For example, during the entire 1977 calendar year he worked only 116 days. He explains this by stating he was involved in three major automobile accidents during that year. Queen also testified on direct examination that after filing his discrimination charge with the EEOC he was subject to numerous disciplinary warnings. Defendants' exhibit 22 is a compilation of all disciplinary warnings given to Queen. That exhibit shows that Queen had received 21 disciplinary tickets, five of which were given to him before the filing of his charge. These disciplinary infractions run the gamut of employee misconduct. They include notices for excessive tardiness, excessive absenteeism, sleeping on the job, not doing assigned work, leaving the plant without authorization and operating a scoop truck in an unsafe manner causing it to overturn.

Queen himself admits that many of these charges did in fact occur. It is the belief of this court that in truth these disciplinary warnings were given for actual offenses committed by Queen.

Despite his poor work history, Queen remains an employee of the company to this day. Additionally, he has received regular promotions both as to his job and as to his pay. This court concludes that Queen has not been subjected to racial discrimination by the company at any time. The evidence clearly establishes that he has been treated more than fairly by the company and has in no way been deprived of any benefit or opportunity because of his race. This conclusion extends to his claim against the union as well. As with the class claim, there is absolutely no evidence which would tend to indicate discriminatory conduct or acquiescence on the part of the union.[21]

A review of Moultrie's testimony and work record shows that he, like Queen, has not been the victim of any form of racial discrimination by either the company or the union. Moultrie was hired into the metalkase department on February 16, 1972. He received several promotions while in that department and was later transferred, at his request, into the maintenance department. The thrust of his testimony at trial was that he was treated less fairly than Robert Sterling, a white employee with whom he worked in the metalkase department. He claims that Sterling was given more favorable job assignment by Clyde Griffin, their foreman. Moultrie does concede, however, that he and Sterling remained in the same job category and received the same pay. This court does not credit the testimony of Moultrie that he was treated less favorably than Sterling on account of his race. The evidence shows that Moultrie was habitually absent from work for extended periods of time. He admitted that he was out of work from early December 1973 to late January 1974 and from early August 1974 to late October

21. Queen's testimony relating to the union was to the effect that the union representatives lack the education and ability to properly represent the rank and file employees against the company representatives. Such testimony does not show any discrimination by the union.

1974. He claims that both of these absences were the result of automobile accidents. Moultrie also admits to missing September, October and part of November 1977. Additionally, he absented himself from work for the two weeks prior to trial claiming that he was suffering from a nervous stomach and back problems. After observing Moultrie throughout the trial, this court is of the opinion that he was not justified in taking off the two weeks prior to trial. In sum, this court finds that Moultrie has been overly generous in giving himself time off from work and that he has been absent without justification on numerous occasions.

Moultrie places great stress on an occurrence of late October 1974. At that time he reported to work after an extended absence without advising the company of his intended return. As a result, he was given a one day demotion to a less favorable job but was paid at his normal rate. Moultrie complained about this demotion and was returned to his regular job the next day. Whatever Moultrie may believe, this court is convinced that this minor incident resulted from Moultrie's failure to apprise the company of his intended return to work and not from racial discrimination.

In March of 1974, Moultrie was indefinitely suspended from his job for insubordination. After being reprimanded by his foreman for failure to report off on the previous Saturday, Moultrie called the foreman a "prejudiced son-of-a-bitch." Through the intervention of the union, Moultrie was ultimately given a five-day suspension for this offense despite the fact that insubordination is listed in the employee handbook as an offense for which an employee can be immediately discharged.

This court's ultimate conclusion with respect to Moultrie's claim against the company is that he has failed to show any type of racial discrimination by it with respect to him. His absenteeism record alone may have justified his termination. The same can be said for his above described act of insubordination. Moultrie, however, has not been terminated. Instead, he has been

regularly promoted and today works as a repairman in the maintenance department. This court does not believe that Moultrie has been at all mistreated by the company for racial reasons or otherwise. His claim against the union is also groundless. He presented no evidence which would show union discrimination or union acquiescence in discrimination. To the contrary, the evidence established that union intervention on his behalf resulted in a mere five-day suspension for the dischargeable act of insubordination committed by him.

### Conclusion

This court concludes that the defendants have not discriminated against plaintiffs Queen or Moultrie on the basis of their race in violation of Title VII or 42 U.S.C. § 1981. This court further concludes that the defendants have not discriminated against the members of the class represented by plaintiff Moultrie on the basis of their race in violation of Title VII or 42 U.S.C. § 1981. As a result, judgment will be entered on behalf of all defendants.

Accordingly, it is this 2nd day of August, 1978, by the United States District Court for the District of Maryland,

ORDERED that judgment be entered in behalf of all defendants.